-

JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
KATHERINE L. HORWITZ, OKLAHOMA STATE BAR NO. 30110
ASSISTANT UNITED STATES ATTORNEY
1290 W. MYRTLE STREET, SUITE 500
BOISE, IDAHO 83702
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

KRISTEN CLARKE
ASSISTANT ATTORNEY GENERAL
ALEC WARD, DISTRICT OF COLUMBIA BAR NO. 1781142
TRIAL ATTORNEY
CIVIL RIGHTS DIVISION
950 PENNSYLVANIA AVENUE
WASHINGTON, DISTRICT OF COLUMBIA 20530

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MATTHEW ALAN LEHIGH,<br><br>Defendant. | Case No. 1:23-cr-00012-BLW<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

The United States of America, by and through the undersigned counsel, respectfully submits this Sentencing Memorandum. The defendant, Matthew Alan Lehigh, comes before the court for sentencing pursuant to a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C). In accordance with the agreement, the defendant has entered a plea of guilty to Counts 1 and 2 of a two-count Superseding Information charging him with two counts of violating of 18 U.S.C. § 249(a)(2). The agreement provides for a sentence of between 37 and 46

months of imprisonment, to be followed by a three-year[1] term of supervised release during which the defendant must remain continuously under the care of a clinical psychiatrist, take all prescribed medication, submit to any doctor-recommended inpatient treatment, and allow the government to monitor his compliance therewith. At the Change of Plea hearing on June 15, 2023, this Court held its acceptance of the plea agreement in abeyance pending completion of the Presentence Investigation Report (PSR) and the parties' submissions as to their position on the appropriate sentence. The parties have each reserved the right to make recommendations to the Court as to the specific sentence to be imposed within the negotiated range.

The United States requests the Court approve the plea agreement and sentence Defendant Lehigh in accordance with its terms. The United States is not recommending a specific sentence and submits that any term of imprisonment within the agreed-upon range would be factually and legally appropriate, adequately punishing the defendant for odious acts of bias-motivated assault while also accounting for his prompt acceptance of full responsibility, and taking into account the undeniable mitigating circumstances related to his mental health.

**I.   Background**

From October 5 to October 12, 2022, the defendant committed a spree of hate crimes targeting gay, lesbian, and transgender residents of Boise. First, he trespassed onto the premises of a gay couple's home and burned a rainbow pride flag flying on their front porch. Next, he used a tire iron to smash the plate-glass windows of a building used as both a nonprofit LGBTQ community support center and the house of worship for an LBGTQ-affirming religious

---

[1] The Plea Agreement as filed (Dkt. 42) called for a five-year term of supervised release, based on the parties' mistaken belief that the three-year terms of supervised release applicable to each count of conviction could be run partially consecutively. After realizing the error, the parties have agreed to amend the Plea Agreement to call for the imposition of two concurrent three-year terms of supervised release.

congregation. Escalating from destruction of property to assault, the defendant then attacked a grocery store customer and a transgender library employee, both of whom he called "faggots" before punching them. When a security guard intervened to defend the library employee, the defendant tried to run the guard over with his SUV, calling him a "faggot" as well. Four days later, he used the same SUV to commit an extraordinarily dangerous ramming attack against two young women whom he believed to be a lesbian couple. Again, he called the victims "faggots" before committing his assault. All of the defendant's victims were perfect strangers to him, and all were targeted for violence and intimidation solely because of their perceived sexual orientation or gender identity. While on his crime spree, the defendant posted a series of short videos on YouTube in which, under the guise of "preaching," he spouted homophobic invective and advocated violence against LGBTQ individuals.

It is undisputed that, at the time of these crimes, the defendant was experiencing mental illness—schizophrenia—that had gone undiagnosed and untreated his entire life. After he was arrested, he explained to police, in great detail, that he had been commanded, by voices that only he could hear, to attack people and places that were, in his words, "anti-God." Although he knew what he was doing was illegal and would likely hurt or even kill innocent people, he elected to obey the voices. In so doing, he instilled fear into the LGBTQ community across the Treasure Valley that anyone could become the target of such violent attacks.

After each criminal act, the defendant fled the scene and effectively evaded law enforcement. Eventually, Boise Police located the defendant in the Treasure Valley. Shortly after the defendant's arrest, an Idaho state court committed him to a mental hospital, where he received intensive inpatient treatment for approximately three months. The treatment, by all accounts, was successful. However, the defendant's actions both before the most acute

manifestations of his mental illness appeared and after they subsided make clear that the homophobic beliefs on which he acted were no mere symptoms, but sincerely held prejudices. The defendant's mother and friends described him as having a history of "freaking out" if he encountered members of the LGBTQ community before he began experiencing hallucinations. Throughout the last six weeks of his hospitalization, the defendant continued to refuse to accept a male cellmate or to share a living space with another man.

The defendant has admitted all relevant conduct and entered a negotiated plea of guilty to charges relating to the most serious of his crimes—two near-deadly vehicular assaults.

The circumstances inescapably raise difficult questions about the appropriate balance of punishment and rehabilitation. The crimes committed are unquestionably serious, with life-long impact on the victims. The defendant's actions after each crime and his later statements to police make it clear that he was not legally insane when he singled out his victims for violence. Had it so chosen, the government could have brought and proven charges that would likely have resulted in the defendant's imprisonment for a decade or more.[2] The seriousness of these potential charges underscores the harm caused to the individual victims and the entire community by such violent acts.

At the same time, the government does not dispute that the defendant's mental illness is a significant mitigating circumstance. The binding plea agreement that the government now asks the Court to accept represents a considered effort to balance these competing considerations. It

---

[2] In particular, the defendant's burning of a pride flag outside a gay couple's home under circumstances evincing an intent to intimidate could have subjected him to 18 U.S.C. § 844(h)'s mandatory ten-year minimum penalty for using fire to perpetrate a felony violation of the federal "cross-burning statute," 42 U.S.C. § 3631. *See, e.g.*, *United States v. Skillman*, 922 F.2d 1370 (9th Cir. 1990) (upholding conviction of defendant convicted of violating both § 3631 and § 844(h) for his role in burning a cross outside African-American family's home).

includes a period of imprisonment that, although less than the maximum that might have been sought, is nevertheless substantial enough to vindicate the purposes of federal sentencing and to punish the defendant for his conscious choice to endanger and terrorize others in disregard of law. It also includes intensive medical supervision after release, to ensure that the defendant does not neglect his mental healthcare and thereby allow himself to return to a condition where his illness might cause him to endanger the public again. Lastly, it will afford the defendant an opportunity, after his release, to build a functional, self-sufficient adult life while of sound mind—an opportunity that his untreated illness previously denied him.

For these reasons, and those discussed below, the United States respectfully requests that this Court accept the plea agreement and sentence the defendant in accordance with its terms.

## II. Sentencing Considerations

In imposing an appropriate sentence in this case, the Court is called upon to consider both the Sentencing Guidelines and the statutory sentencing factors enumerated in 18 U.S.C. § 3553. Notwithstanding the inclusion of a negotiated binding sentence in the agreement, the Court must first determine the guideline range under the United States Sentencing Guidelines. *Hughes v. United States*, 138 S. Ct. 1765, 1773 (2018) ("In deciding whether to accept an agreement that includes a specific sentence, the district court must consider the Sentencing Guidelines. The Court may not accept the agreement unless the Court is satisfied that '(1) the agreed sentence is within the applicable guideline range; or (2), (A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity.'" (quoting U.S.S.G. § 6B1.2)). If the Court decides to accept the Agreement, the § 3553 factors may instruct its decision as to the specific sentence to impose within the negotiated range.

### A. The Guideline Range

The guideline sentence applicable in this case is 33 to 41 months of imprisonment, based on a Total Offense Level of 21 and a Criminal History Category of I. Therefore, the penalty range stipulated in the Plea Agreement (37 to 46 months) lies partially within and partially outside of the Guideline range.³

**Adjusted Offense Level**

The government agrees with the Probation Office that the Adjusted Offense Level applicable to both Count 1 and Count 2 is 21.

**Base Offense Level**

The guideline applicable to federal hate crime convictions under 18 U.S.C. § 249(a) provides that the base offense level is "the offense level from the offense guideline applicable to any underlying offense." U.S.S.G. § 2H1.1(a)(1). The Probation Office correctly identified the underlying offense as Aggravated Assault, and cross-referenced to U.S.S.G. § 2A2.2 to determine the base offense level. The Base Offense Level for Aggravated Assault is 14. Because

---

³ The parties originally intended the Plea Agreement's stipulated range to be identical to the guideline range. However, the guideline range in this case will be affected by amendments to the Guidelines Manual that will take effect on November 1, 2023—the day before the scheduled sentencing hearing in this case. Application of the 2021 Guidelines Manual yielded a guideline sentence of 36 to 47 months of imprisonment, based on a Total Offense Level of 21 and a Criminal History Category of II. The 2023 Amendments to the Sentencing Guidelines eliminate the two-point Criminal History Score enhancement, applicable when the instant offense was committed while on probation or parole, that resulted in the defendant's placement in Criminal History Category II. Therefore, the defendant's proper Criminal History Category on the date of sentencing will be Category I. U.S.S.G. § 1B1.11(a) (providing that guideline sentence shall be calculated "us[ing] the Guidelines Manual in effect *on the date of sentencing*") (emphasis added). This results in a guideline range lower than the parties anticipated during plea negotiations. Therefore, if the Court elects to impose a sentence that is within the Plea Agreement's stipulated range but outside the guideline range (i.e., a sentence of 42 to 46 months), the Court must find that "justifiable reasons" exist for the imposition of an agreed sentence outside the applicable guideline range, and set forth those reasons with specificity in the statement of reasons form. U.S.S.G. § 6B1.2(c)(2).

a dangerous weapon (a car) was "otherwise used" in the offense, four levels should be added to the Base Offense Level pursuant to the Specific Offense Characteristic described by U.S.S.G. § 2A2.2(b)(2)(B). This results in a total unadjusted offense level of 18.

**Upward Adjustment for Hate Crime Motive**

The Probation Office correctly applied a three-point upward adjustment for selection of victim on the basis of actual or perceived sexual orientation of any person, pursuant to U.S.S.G. § 3A1.1(a).

Section 3A1.1(a) is an atypical provision of the Sentencing Guidelines in that it requires that a court imposing sentence pursuant to a plea agreement make a specific factual finding to the heightened standard of beyond a reasonable doubt. U.S.S.G. § 3A1.1(a). Specifically, § 3A1.1 requires that the sentencing court find that "the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person." *Id.*

In this case, a sufficient basis exists for the Court to make this finding, and the government requests that it do so. Pursuant to his written plea agreement with the government, the defendant acknowledged and affirmed that he is in fact guilty of the offenses charged in Counts 1 and 2 of the Superseding Information, each of which alleges that he willfully attempted to cause bodily injury to his victims, because of the actual and perceived sexual orientation of identified persons. Furthermore, by signing the Plea Agreement, the defendant affirmed the truth of the included Factual Basis, which stipulated that he selected the victim of Count One because of the perceived sexual orientation and gender identity of the library employee whom the victim was attempting to defend, and that he selected the victims of Count Two because he believed

7

they were lesbian. Accordingly, the government submits that sufficient evidence exists for this Court to find, beyond a reasonable doubt, that the defendant intentionally selected victims and property as the object of the offense of conviction on Count 1 of the Indictment because of the actual or perceived race, color, and, national origin, of any person, and to apply the three-level upward adjustment provided for by U.S.S.G. § 3A1.1(a) to the Adjusted Offense Level for each of Counts 1 and 2, bringing the Adjusted Offense Level for each count to 21.

### Adjustment for Multiple Counts

The government agrees with the Probation Office that the Total Offense Level should be adjusted upward by two levels pursuant to U.S.S.G. § 3D1.4, based on a total of two counts of conviction, each with an adjusted offense level of 21. This adjustment brings the Total Offense Level to 23.

### Downward Adjustment for Acceptance of Responsibility

The government agrees with the Probation Office that the defendant has demonstrated acceptance of responsibility by entering a guilty plea, entitling him to a two-level downward adjustment pursuant to U.S.S.G. § 3E1.1(a). Additionally, the government hereby moves for an additional one-level downward adjustment pursuant to U.S.S.G. § 3E1.1(b), on the basis that the defendant timely notified authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently. Accordingly, the government submits that the defendant's offense level should be adjusted downward by a total of three levels for acceptance of responsibility, to a Final Offense Level of 20.

**Criminal History Category**

The government agrees with the Probation Office that the defendant's Criminal History Category under the 2023 Amendments to the Sentencing Guidelines, effective as of November 1, 2023, is I. At the time of the offenses of conviction, the defendant was on probation for a single Oregon misdemeanor count of simple assault. The government's investigation determined that the prior conviction arose from an incident in which the defendant, while experiencing a paranoid delusion, attempted to evade imagined pursuers by trespassing onto the driveway of a private home. When the homeowners attempted to physically detain the defendant, a scuffle ensued in which both the defendant and one of the homeowners sustained minor injuries. The defendant fled and was arrested a short distance away. The defendant was sentenced to 45 days imprisonment and 24 months of probation, the latter of which had not elapsed by the time of his arrest on October 12, 2022. The conviction results in one criminal history point, and the pending probationary sentence adds no additional points. Therefore, the total criminal history score is one, corresponding with a Criminal History Category of I.

B.   **Statutory Sentencing Factors under 18 U.S.C. § 3553**

The federal sentencing statute, 18 U.S.C. § 3553, provides that, in addition to the Guidelines, a sentencing court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. With these factors in mind, the court should fashion a sentence that is sufficient, but not greater than necessary, to carry them out. *Id.* Because the Sentencing

Guidelines are advisory in nature, a court may vary from the applicable guideline sentence in order to impose a sentence that complies with the directives of § 3553. *United States v. Booker*, 543 U.S. 220 (2005).

**The Nature and Circumstances of the Offense**

The nature and circumstances of the instant offenses are largely aggravating. The defendant has admitted to committing a spree of anti-LGBTQ bias-motivated assaults and property crimes in the city of Boise during the first two weeks of October 2022. As detailed in the Plea Agreement (Dkt. 42), the crimes included vandalism of a house of worship, two unprovoked physical assaults, an act of arson, and a pair of potentially deadly vehicular assaults. Individually, each of these crimes was serious. The egregiousness of attempting to run three perfect strangers over with an SUV hardly needs explication, but even the lesser-seeming crimes caused substantial harm. The defendant assaulted two people who were going about their everyday business—one working at her job as a librarian, one shopping for groceries—for no other reason than his assumptions about their sexual orientation and religious beliefs. He also did thousands of dollars of damage to a building jointly occupied by a charitable and a religious organization, straining the limited financial resources those groups use to provide spiritual and material support to Boise's LGBTQ community. Finally, he violated the privacy and sanctity of a family's home by trespassing onto it at night, and endangered the safety of those sleeping within by setting fire to a flag affixed to the wooden front porch—an act that, although perhaps intended as symbolic, risked starting a deadly house fire.

As detailed in the multiple victim impact statements submitted to the Court, the defendant's crime spree also had a significant collective impact. Each of the assaults occurred in a public place, targeted a person engaged in innocent, everyday conduct, and was prefaced by a

fusillade of slurs and hateful invective. By announcing his motive, the defendant clearly broadcast the message that LGBTQ residents of Boise were not safe going about their daily business. A message that reverberated across that community—even causing some to leave the State of Idaho. The effects of such random violence, like the effects of acts of terrorism, extend beyond those individually targeted. During the days that the defendant was at large, word of a series of unsolved crimes against LGBTQ citizens spread, causing some LGBTQ residents of Boise—quite reasonably—to fear for their own physical safety while buying groceries, doing their jobs, using public facilities, and performing other daily tasks. Because the victims were targeted because of perceived sexual orientation and gender identity, these crimes created a climate of fear among those who heard about them and belonged to the targeted demographic, compounding the serious individualized harms they inflicted on their victims.

### The History and Characteristics of the Defendant

The defendant appears to have led a mostly nonviolent life until his late twenties, when he experienced another rapid and dramatic decline in mental health. Based on information provided to the government by his family members and former associates, he began exhibiting erratic behavior and expressing delusional beliefs some time in the year 2019 and employed illegal substances to cope. This corresponded with the sudden development of an explosive temper and an obsession with bizarre conspiracy theories about mind control and artificial intelligence. Although the defendant had previously been living independently and maintaining employment, these tendencies made it effectively impossible for him to hold a job, and he reverted to financial dependency on his parents.  Nevertheless, he was apparently never encouraged or required by his parents to seek sustained mental health treatment. In the year prior

to his arrest, he had been living out of his car, having moved out of his father's house following an intense argument about his persistent unemployment.

With respect to the instant offenses, one aspect of the defendant's personal history is both aggravating and particularly troubling. The government's investigation indicated that the defendant's animus toward gay, lesbian, and transgender people was a sincere and long-held prejudice, rooted in his upbringing. The government spoke to individuals who had known the defendant and members of his family to make negative remarks about gay, lesbian, and transgender people many years before he began exhibiting symptoms of schizophrenia. Moreover, the defendant previously acted violently toward others upon these beliefs when he attacked a coworker whom he believed was gay. Even in his 2023 interview with the probation office, he continued to express his homophobic beliefs. PSR ¶ 22. His history of selecting LGBTQ individuals as the targets of his frenzied violence was not entirely the random artefact of an unwell mind, but rather an amplified manifestation of a sincerely held prejudice. Although prejudice and bigotry are not crimes, the government considers it aggravating that the defendant acted on an existing and continuous sincere prejudice, as opposed to one borne out of mental illness alone.

### III. Government's Sentencing Recommendation

The Plea Agreement in this case includes a binding joint recommendation that the defendant be sentenced to between 37 and 46 months of imprisonment. As noted above, a sentence of between 37 and 41 months would be within the guideline range. If the Court accepts the agreement and imposes such a sentence, it need not make a specific finding that there are justifiable reasons to accept a Rule 11(c)(1)(C) agreement. U.S.S.G. § 6B1.2. However, if the Court accepts the agreement and imposes a sentence outside of the guideline range (possible only

if the Court imposes a sentence of greater than 41 but equal to or less than 46 months of imprisonment), it must make such a finding. *Id.*

The government believes that any sentence within the negotiated range would be appropriate, and it therefore takes no position on the specific number of months that should be imposed. Consistent with the Plea Agreement, the government also requests that the defendant be given credit towards his sentence for each day served in federal pretrial detention, plus 119 days of time served in state pretrial custody on related charges. Although the government understands that binding plea agreements under Rule 11(c)(1)(C) are not favored by this Court, there was a particular need in this case to narrowly and certainly tailor the penalty to reconcile the defendant's medical needs and personal circumstances with the compelling public interests in punishing hate crimes and protecting public safety.

In light of the simultaneous presence of unusually strong aggravating and mitigating circumstances in this case, the government respectfully requests that the Court accept the Plea Agreement and sentence the defendant in accordance with its terms.

Respectfully submitted this 26th day of October, 2023.

JOSHUA D. HURWIT
UNITED STATES ATTORNEY
By:

*/s/ Katherine Horwitz*
KATHERINE HORWITZ
Assistant United States Attorney

KRISTEN M. CLARKE
ASSISTANT ATTORNEY GENERAL
By:

*/s/ Alec C. Ward*
Alec C. Ward
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 26, 2023, the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| Mark Ackley<br>702 W. Idaho Street<br>Boise, ID 83702 | ☐ United States Mail, postage prepaid<br>☐ Fax<br>☒ ECF filing<br>☐ Email |

                                            */s/ Alec Ward*
                                            Alec Ward
                                            Trial Attorney
                                            Civil Rights Division, Criminal Section
                                            U.S. Department of Justice